IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

TWYLA ROOD                                                                                      PLAINTIFF

vs.                                        CIVIL NO. 05-6047

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                                                    DEFENDANT

## MEMORANDUM OPINION

Twyla Rood ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration, denying her applications for disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"), under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were filed on July 28, 2003, alleging an onset date of January 1, 1997,[1] due to bipolar disorder, dissociative disorder,[2] schizoaffective

---

[1]The transcript record indicates that plaintiff previously filed concurrent applications for disability under the Act on December 28, 1999, with the same alleged onset date of January 1, 1997. (Tr. 54-57, 387-90). These applications were denied at the initial level on February 29, 2000, and not appealed any further. (Tr. 23, 391). Normally, such denials should be *res judicata* as to the existence of disability on or before that date. *See Yeazel v. Apfel*, 148 F.3d 910, 912 (8th Cir. 1998); *Davis v. Sullivan*, 977 F.2d 419, 420 (8th Cir. 1992); 20 C.F.R. § 404.957(c)(1). However, it is apparent from the ALJ's decision that he never exercised *res judicata.* (Tr. 11-15). Arguably, the ALJ constructively reopened the prior applications by considering evidence from that time period, and concluding that the relevant period was from plaintiff's previously alleged onset date of January 1, 1997. (Tr. 11, 14). *See King v. Chater*, 90 F.3d 323, 325 (8th Cir. 1996)(where a claim is reconsidered on the merits, it is treated as having been reopened as a matter of administrative discretion, but there can be no constructive reopening after four years from the date of the notice of the initial denial because the concept cannot extend beyond the scope of authority granted under the regulations); 20 C.F.R. § 404.988(b). Consequently, the relevant period for Plaintiff's current disability applications is from her onset date of January 1, 1997, through the date of the Commissioner's final decision of March 30, 2005 (Tr. 14-15, 59).

[2]The essential feature of a dissociative disorder is disruption in the usually integrated
(continued...)

disorder,[3] depression, and borderline personality disorder. (Tr. 59, 107, 136). An administrative hearing was held on November 8, 2004. (Tr. 400). Plaintiff was present and represented by counsel.

On March 30, 2005, the Administrative Law Judge ("ALJ"), issued a written opinion finding that, although severe, plaintiff's depression, borderline personality disorder, and borderline intellectual functioning did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 15). At that time, plaintiff was thirty-three years old and possessed an eighth grade education. (Tr. 11). The record reflects that she has past relevant work experience ("PRW"), as a cashier/stocker, carwash attendant, waitress, nurses' aide, and hotel maid. (Tr. 11).

After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ("RFC"), to perform work-related activities involving no more than routine interpersonal contact with others, detailed or complex tasks with few variables and little judgment, and tasks requiring only simple, direct, and concrete supervision. (Tr. 15). With the assistance of a vocational expert, the ALJ then found that plaintiff could perform her PRW as a

---

[2](...continued)
functions of consciousness, memory, identity, or perception. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR, pp. 519 (4th ed. Revised 2000)(DSM-IV). The disturbance may be sudden, gradual, chronic, or transient. *Id*.

[3]Schizoaffective disorder is a perplexing mental illness distinguished by a combination of symptoms of a thought disorder, or other psychotic symptoms such as hallucinations or delusions (schizophrenia component), and those of a mood disorder (depressive or manic component). The diagnosis is made when the patient has features of both illnesses, but does not strictly meet diagnostic criteria for either schizophrenia or a mood disorder alone. *See* Guy E. Brannon, *Schizoaffective Disorder*, at www.emedicine.com; *see also*, *Hutsell v. Massanari*, 259 F.3d 707, 709 (8th Cir. 2001) (citing STEDMAN'S MEDICAL DICTIONARY, p. 1579 (26th ed. 1995); DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR, p. 319 (Fourth ed. 2000).

waitress and hotel maid. (Tr. 14-15).

On June 10, 2005, the Appeals Council declined to review this decision. (Tr. 14-15). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 9, 10).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines

3

"physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

**Discussion:**

Of particular concern to the undersigned is the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such

4

as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

As in the present case, the evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. *Id.* Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." *Id.* Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired than their symptoms indicate. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001); 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999). This limited tolerance for stress is particularly relevant because a claimant's residual functional capacity is based on their ability to "perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).

In the present case, the medical records reveal the following. On July 27, 1999, plaintiff was referred for mental health treatment due to uncontrollable anger. (Tr. 213). Records indicate that plaintiff had a chaotic family history. (Tr. 213). She started drinking at age twelve, and dropped out of school at age sixteen. (Tr. 213). She had one prior arrest for manufacturing and selling crystal

5

methamphetamine, and served one year in prison. (Tr. 214). Plaintiff also reported being raped on at least two previous occasions. Following an evaluation, plaintiff was diagnosed with schizoaffective disorder, dissociative disorder not otherwise specified, and deferred borderline tendencies. (Tr. 216). Her global assessment of functioning was noted to be forty-five.[4] (Tr. 216).

On July 28, 1999, plaintiff was evaluated by Dr. Eugene Watermann. (Tr. 210-12). She told Dr. Watermann that she experienced both visual and auditory hallucinations, as well as mood swings. Dr. Watermann noted that plaintiff was depressed, but denied any particular thoughts about death or suicide. (Tr. 210). Noting that a diagnosis was difficult to discern, Dr. Watermann diagnosed plaintiff with dissociative disorder, not otherwise specified, and possible schizoaffective disorder. (Tr. 212). He then prescribed Depakote to control her anger. (Tr. 212).

On August 9, 1999, plaintiff again sought mental health treatment after calling the emergency line and speaking to Dr. Watermann. (Tr. 205). She had reportedly experienced an anger outburst while trying to discipline her daughter. Plaintiff reported feeling out of control, and experiencing thoughts of self harm. (Tr. 205). On August 10, 1999, she participated in a group therapy session. (Tr. 204-205). At this time, the possibility of inpatient psychiatric hospitalization was discussed. (Tr. 204).

On August 18, 1999, plaintiff was admitted as an inpatient to the psychiatric ward at Levi Hospital in Hot Springs, Arkansas. (Tr. 174). Her family had voiced concerns regarding severe

---

[4] A global assessment of functioning score of forty-five is indicative of "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV, p. 34 (4th ed. Revised 2000).

6

mood swings, stating that she often experienced "violent fits," and was unable to control her impulses. However, plaintiff had no memory of these events. (Tr. 176). She also claimed to be experiencing visual hallucinations. (Tr. 174).

Upon admission, a physical examination was normal. (Tr. 177-78). Plaintiff tested positive for Benzodiazepine, but all the other blood and lab tests were normal. (Tr. 174). An electroencephalogram (EEG), was normal, aside from registering some excessive fast activity, which the examiner noted to be likely caused by medication. An electrocardiogram (ECG), was also unremarkable. On August 25, 1999, Dr. Michael Goldman discharged plaintiff with samples of Paxil. At the time of discharge, plaintiff's mental status was stable with normal mood and affect, and no evidence of hallucinations or impulsive behaviors. Her thought process was coherent and goal directed with no evidence of memory problems. Further, plaintiff's insight and judgment were noted to be fair. Dr. Goldman diagnosed her with panic disorder, current hypomania; obesity; and, rule out bipolar disorder. (Tr. 175). Plaintiff was prescribed Paxil, given a one month's supply of the medication, and instructed to follow-up with Dr. Watermann. (Tr. 174).

On September 20, 1999, plaintiff told Dr. Watermann that she had stopped taking Depakote because it gave her hard lumps under the skin. (Tr. 200). However, she indicated that the Paxil had increased her mood and made her feel "somewhat calmer." Plaintiff stated that, even though she was on Medicaid, she had not yet received her card, so she could not get her Paxil prescription refilled. (Tr. 200). Dr. Watermann gave her samples of Celexa to take if she ran out of Paxil. (Tr. 200).

On October 7, 1999, plaintiff returned for a follow-up appointment with Dr. Watermann. (Tr. 199). She complained of continued mood swings and sudden anger outbursts. Further, plaintiff had apparently misunderstood Dr. Watermann's previous directions, and had begun taking Celexa and

7

Paxil together. She told Dr. Watermann that they were no longer working. Dr. Watermann noted that it was possible that plaintiff was suffering from a borderline personality disorder, but also felt that her anger could be associated with her depression. (Tr. 199). As such, he discontinued plaintiff's current medication regime, and placed her on Effexor and Remeron. (Tr. 199).

On December 21, 1999, plaintiff reported to Dr. Watermann that she still experienced sudden anger outbursts. (Tr. 197). Counseling notes also revealed an increase in dissociative and violent episodes. (Tr. 198). Plaintiff stated that she had "stabbed at" her husband, hit him, and tried to choke him. She also indicated that she had lost a job due to her anger management issues. (Tr. 197). Plaintiff stated that her anger was precipitated by an imaginary friend who took over to protect her from harm. (Tr. 197). She also reported hearing voices at night that prevented her from sleeping. Dr. Watermann directed plaintiff to continue her Effexor and Remeron, and added Risperdal. (Tr. 197).

On December 28, 1999, Dr. Watermann received a call from plaintiff's mother-in-law stating that plaintiff's condition had deteriorated. (Tr. 196). Apparently, plaintiff was screaming that she hated everyone, talking about killing her children, and was seen rocking back and forth on the kitchen floor. (Tr. 196). Dr. Waterman discussed the situation with plaintiff, who stated that she did not remember the incident. (Tr. 196). However, plaintiff indicated that the Risperdal made her hallucinations and dreams more vivid. (Tr. 196). *See* PHYSICIAN'S DESK REFERENCE, pp. 1658-1659 (60th ed. 2006). Dr. Watermann discussed the idea of plaintiff being voluntarily readmitted to the hospital, however, plaintiff stated that she wanted to wait until after the New Year's holiday, so she could spend the time with her family. (Tr. 196). Plaintiff's mother-in-law agreed to the delay. Dr. Watermann instructed plaintiff to discontinue the Risperdal, and scheduled her for an appointment

8

after the holidays. (Tr. 196).

On January 3, 2000, Dr. Watermann formally recommended that plaintiff be admitted into the Levi Hospital for a psychiatric evaluation. (Tr. 193-94). Psychiatric treatment records dated between January 3, 2000, and January 10, 2000, reveal that plaintiff was treated for uncontrollable anger and violence against family members. (Tr. 161). She had also reportedly experienced episodes of dissociation. (Tr. 193). Blood work was positive for Benzodiazepines, but negative for all other controlled substances. (Tr. 161). A detailed physical examination was not performed, but plaintiff's right wrist was examined after she complained of pain. (Tr. 161). A physical examination revealed a limited range of motion with pain and tenderness, however, an x-ray of her right wrist was normal. (Tr. 164-165, 167). The examination also revealed tenderness of palpation of the fingers of the right hand, as well as a very limited range of motion and loss of sensitivity in the fingertips.

Upon admission, plaintiff was subject to individual and group therapy, as well as occupational and recreational therapy. (Tr. 161). She responded "quite well" to these measures, exhibiting a significantly decreased level of hostility and a "much more mellow and positive outlook on life." (Tr. 161). Dr. Goldman advised plaintiff to discontinue Effexor and Remeron, substituting Wellbutrin in their place. (Tr. 161). A mental status examination conducted at the time of discharge revealed that she was coherent, goal directed, exhibited normal speech, and possessed a full range of affect. (Tr. 161). There was no evidence of suicidal or homicidal ideations and no psychotic symptoms. (Tr. 161). Further, her insight and judgment were characterized as fair. (Tr. 161). Dr. Goldman noted that plaintiff was "quite optimistic" and was looking forward to spending time with her family. (Tr. 161). His final diagnoses were bipolar disorder with most recent episode being depressed, personality disorder not otherwise specified, financial and family stressors, and rule out

9

attention deficit and hyperactivity disorder. (Tr. 162). Plaintiff was noted to have a global assessment of functioning score of fifty.[5] (Tr. 162).

A therapy record from Community Counseling Services dated January 18, 2000, noted that plaintiff continued to experience improvement and insight into her anger management problem. (Tr. 191). Further, on February 4, 2000, plaintiff reported that she was doing fairly well on Wellbutrin. (Tr. 190). She also acknowledged that she was feeling better. (Tr. 190).

On October 7, 2003, plaintiff was sent for a consultative mental status evaluation with Dr. Janet L. Abbe. (Tr. 213-16, 225-32). Plaintiff reported multiple symptoms consistent with depression and anxiety, as well as auditory and visual hallucinations. (Tr. 225). During the exam, plaintiff told Dr. Abbe that she discontinued treatment at Community Counseling Services in 2001, because she thought people were laughing at her. (Tr. 226). Records indicate that plaintiff had not since sought further mental health treatment. (Tr. 226). However, in spite of her failure to seek treatment, plaintiff indicated that she had continued to experience these symptoms, and had been fired from many jobs, due to an inability to manage her anger. (Tr. 226).

A mental status examination revealed that plaintiff's attitude and behavior were pleasant and cooperative, and her stream of mental activity revealed speech that was spontaneous and well organized. (Tr. 227). Despite the fact that she reported hearing laughter and seeing little green devils sitting on her dresser, the examiner found her to be properly oriented to her surroundings. (Tr. 227-

---

[5]A global assessment of functioning score of fifty is indicative of "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV, p. 34 (4th ed. Revised 2000).

10

28). Her affect was constricted and her mood euthymic. Dr. Abbe estimated plaintiff's intellectual quotient (IQ) to be within the seventy-one to seventy-nine range, but no formal testing was done. (Tr. 229). The examiner felt plaintiff was not mentally retarded and could manage her funds without assistance. (Tr. 231-32). She diagnosed plaintiff with bipolar disorder and antisocial personality disorder. (Tr. 229). Dr. Abbe noted that plaintiff had not been in treatment since 2001, and felt her symptoms would lessen if she were consistently treated. (Tr. 229).

Plaintiff returned to Community Counseling Services on November 17, 2003. (Tr. 275). Apparently, she was upset because her second disability application had been denied. Plaintiff indicated that she was not taking any psychotropic medications. (Tr. 275, 279). According to the intake assessment, plaintiff claimed that she did not want to be around people, or live anymore. (Tr. 275). However, the intake assessment also stated that plaintiff was not a risk to herself or her family. (Tr. 281). A master treatment plan consisting of psychotropic medication management and group therapy was prepared and approved on November 18, 2003, by Dr. Kenneth K. Vest. (Tr. 270-71). It indicated that plaintiff's global assessment of functioning score was forty-five.[6] (Tr. 270).

Plaintiff was again hospitalized at the National Park Medical Center in Hot Springs, Arkansas, from April 7, 2004, until April 10, 2004. (Tr. 286). Records indicate that she tried to stab herself with a knife. (Tr. 286). Prior to the incident, plaintiff had been self-medicating with the antidepressant Zoloft, which she obtained from her father. (Tr. 286). However, she had run out of

---

[6]A global assessment of functioning score of forty-five is indicative of "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV, p. 34 (4th ed. Revised 2000).

11

medication several weeks prior to her suicide attempt, and had begun to show significant depressive symptoms, including low mood, poor concentration, poor sleep and appetite, and suicidal ideations.

In the hospital, plaintiff was administered Lexapro and Trazodone. (Tr. 286). She showed a good response to these medications, with gradual improvement in her mood and a cessation of suicidal ideations. (Tr. 286). Upon discharge, plaintiff was told to seek follow-up treatment with a mental health professional, namely, Dr. Vest. (Tr. 286). She was also given prescriptions for Lexapro and Trazodone. (Tr. 287).

On December 15, 2004, plaintiff underwent a consultative mental status examination with Dr. Paul L. DeYoub, a clinical psychologist. (Tr. 372). Plaintiff told the examiner that she last used methamphetamine in 1997, before she went to prison, and denied using illegal drugs since her release in 1998. (Tr. 374). Plaintiff indicated that she was not taking any psychotropic medications. (Tr. 373). Dr. DeYoub administered the Wechsler Adult Intelligence Scale – Third Edition to plaintiff, and recorded a verbal IQ score of seventy-eight, a performance IQ of seventy-four, and a full scale IQ of seventy-four. (Tr. 375). This placed her in the borderline range of intellectual functioning. (Tr. 375). Dr. DeYoub noted that these IQ scores were consistent with his expectations after speaking with plaintiff, and were therefore considered valid. (Tr. 375, 379). Plaintiff was also administered the Minnesota Multiphasic Personality Inventory–II (MMPI-II) test. (Tr. 376). This revealed that plaintiff had attempted to answer her questions in the most bizarre way possible. (Tr. 376). Her scores also reflected very histrionic and dramatic personality traits, but Dr. DeYoub noted that plaintiff did suffer from a borderline personality disorder. (Tr. 376). On the test, plaintiff made no effort to mention anything positive about herself. (Tr. 377). Overall, her MMPI-II scores were very consistent with a personality disorder. (Tr. 376). The examiner found no evidence of organic

involvement and stated that plaintiff did not exhibit any pain behaviors. (Tr. 372, 378).

Dr. DeYoub diagnosed plaintiff with depressive disorder, borderline personality disorder, and borderline intellectual functioning. (Tr. 378). Dr. DeYoub stated that a borderline personality disorder was one of the worst personality disorders listed. (Tr. 378). According to his notes, this disorder is characterized by a persuasive pattern of interpersonal instability, depression, substance abuse, antisocial contact, and marked impulsivity. (Tr. 378). As such, Dr. DeYoub concluded that plaintiff would have moderate limitations in her ability to respond appropriately to supervision, co-workers, and work pressure. (Tr. 379).

Further, the RFC assessments contained in the file reveal, as follows. On February 25, 2000, Dr. Brad Williams, a non-examining, consultative psychologist, completed a mental RFC assessment and a psychiatric review technique form. (Tr. 255-267). After reviewing plaintiff's medical records, he concluded that plaintiff had moderate limitations in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and, set realistic goals or make plans independently of others. (Tr. 264-265). He found slight limitations with regard to her ability to perform activities of daily living, and concluded that the evidence was insufficient to determine whether she experienced episodes of decompensation. (Tr. 262).

On October 17, 2003, Dr. Williams completed a second mental RFC assessment and psychiatric review technique form. (Tr. 233-254). After reviewing plaintiff's medical records, he concluded that she was moderately limited with regard to her ability to understand, remember, and

13

carry out detailed instructions; maintain attention and concentration for extended periods of time; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and, set realistic goals or make plans independently of others. (Tr. 233-234, 249). He also noted mild limitations in her ability to perform activities of daily living, but no episodes of decompensation. (Tr. 249).

In spite of the aforementioned medical records and RFC assessments, the ALJ concluded that plaintiff maintained the RFC to perform work-related activities involving no more than routine interpersonal contact with others, detailed or complex tasks with few variables and little judgment, and tasks requiring only simple, direct, and concrete supervision. (Tr. 15). He did not, however, take her angry outbursts or visual and auditory hallucinations into consideration. (Tr. 13). The ALJ also failed to note her episodes of decompensation that required inpatient treatment. (Tr. 13). As such, we believe that remand it necessary to allow the ALJ to reevaluate plaintiff's mental RFC. *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (holding that the ALJ is not free to ignore medical evidence, rather must consider the whole record).

Further, in the hypothetical question addressed to the vocational expert, the ALJ failed to specifically mention plaintiff's borderline intellectual functioning. The United States Court of Appeal for the Eighth Circuit, however, has "previously concluded that borderline intellectual functioning. . . is a significant nonexertional impairment that must be considered by a vocational expert." *Lucy v. Chater,* 113 F.3d 905, 908 (8th Cir.1997); *Foreman v. Callahan*, 122 F.3d 24, 26 (8th Cir. 1997). Because the ALJ concluded that plaintiff's borderline intellectual functioning was a severe impairment, the fact that he did not include borderline intellectual functioning in his

14

hypothetical is not supported by substantial evidence of record, and therefore the ultimate decision as to disability is in error. (Tr. 15). As such, the Commissioner is directed to do so, on remand.

We also note that the ALJ failed to properly consider plaintiff's financial situation. The record contains several references to plaintiff's application for Medicaid, and her need for medication samples. (Tr. 174, 200, 286, 407-408). Although it is for the ALJ in the first instance to determine a plaintiff's motivation for failing to follow a prescribed course of treatment, or to seek medical attention, such failure may be excused by a claimant's lack of funds. *Tome v. Schweiker,* 724 F.2d 711, 714 (8th Cir. 1984); *Jackson v. Bowen*, 866 F. 2d 274, 275 (8th Cir. 1989). "[T]he ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances." *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (citing *Tome*, 724 F.2d at 714). Economic justifications for lack of treatment can be relevant to a disability determination. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992). Accordingly, on remand, the ALJ is directed to consider plaintiff's financial situation.

## **Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence, and therefore, the denial of benefits to the plaintiff, should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

ENTERED this 20th day of September 2006.

/s/ Bobby E. Shepherd
HONORABLE BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)